| | |
|---|---|
| DISH NETWORK L.L.C. | CIVIL ACTION |
| VERSUS | No. 16-869 |
| WLAJ-TV, L.L.C. | SECTION: "J" (3) |

## <u>ORDER AND REASONS</u>

Before the Court is a *Motion to Dismiss or, in the Alternative, Motion for Summary Judgment* **(Rec. Doc. 27)** filed by Defendant, WLAJ-TV. At the direction of the Court, Defendant clarified in a pocket brief (Rec. Doc. 30) that it believed that this matter could be disposed of via 12(b)(6), because cited to exhibits were referenced implicitly in the Complaint. Plaintiff filed an opposition (Rec. Doc. 32), to which Defendant replied (Rec. Doc. 34). Having considered the Motion and legal memoranda, the record, and the applicable law, the Court finds that Defendant's Motion should be **DENIED**.

## <u>FACTS AND PROCEDURAL BACKGROUND</u>

Plaintiff, DISH Network L.LC., is a major subscription-television provider in the United States, which delivers its services to its customers via satellite transmissions. In order to provide content to its subscribers, DISH contracts with local television stations. On August 31, 2012, DISH executed a re-transmission consent agreement (the "Sinclair Agreement") with the Sinclair Broadcast Group for re-transmission of content produced by 82 of Sinclair's TV stations. (Rec. Doc. 27-6). Among the stations was WLAJ-TV, a station assigned to the Lansing, Michigan

market area. WLAJ is currently owned by Defendant, WLAJ-TV, LLC. (Rec. Doc. 15 at 1-2).

The Sinclair Agreement was deemed to be effective on August 16, 2012. (Rec. Doc. 27-6 at 1). Per its terms, DISH agreed to pay Sinclair a fee for each of the stations that it would rebroadcast. The fee was on a per subscriber basis and would depend on the affiliated network. Also, among the Sinclair Agreement's terms was a "More Favorable Fee" provision, which acted as a "most favored nation" ("MFN") clause. (Rec. Doc. 15 at 2). In section 22 of the Sinclair Agreement, Sinclair promised that if it granted a re-transmission fee more favorable to certain re-transmitter-competitors of DISH, by more than half a cent per subscriber than that paid by DISH, Sinclair would offer DISH the benefit of the more favorable fee. The Sinclair Agreement was set to expire on August 15, 2015. However, section 23 provides:

> **Audit Right.** During the term and for one (1) year thereafter, each party will have the right, upon reasonable, prior notice, to conduct an audit of the other party's books and records that are reasonably necessary to verify the accuracy of the Re-transmission Fees paid by DISH and/or verify Operator's compliance with its obligations under Section 22.

(Rec. Doc. 27-6 at 14). Additionally, section 24 states:

> **Survival.** Any provision of this Agreement which logically would be expected to survive termination or expiration of the Agreement shall survive termination or expiration.

(Rec. Doc. 27-6 at 14). On November 13, 2012, Sinclair sent a notice to DISH indicating that Sinclair intended to sell WLAJ-TV to Defendant, with an assurance that Defendant would "assume all of Sinclair's obligations under the Agreement as they relate to WLAJ-TV." (Rec. Doc. 39-4 at 2). The Sinclair Agreement states that

subject to such notice, "DISH hereby consents . . . in the case of assignment or transfer of control of one or more, but less than all of the Stations then operated by [Sinclair], to the assignment of such portion of this Agreement as may then be applicable to such Station." In April of 2013, Defendant's parent company notified DISH that it had acquired substantially all of the assets to WLAJ and that Defendant had "assumed certain Station contracts, including the [Sinclair] Agreement." (Rec. Doc. 39-5 at 2).

However, Defendant claims that when it gave notice it was assuming the Sinclair Agreement, Sinclair had presented Defendant only with a redacted version of the Sinclair Agreement (the "Redacted Sinclair Agreement"), which lists a section 22 among its numbered items, but omits its content. (Rec. Doc. 27-4 at 13). While the substance of section 22 has been whited out, the Redacted Sinclair Agreement does not in any way obscure the audit right described in section 23. (Rec. Doc. 27-6 at 12-13). Rather, the Redacted Sinclair Agreement clearly states that DISH may employ an audit to "verify Operator's compliance with its obligations in section 22 hereof."

On October 29, 2015—after the expiration of the Sinclair Agreement, but during the 1-year grace period—DISH notified Defendant that it intended to conduct an audit to ensure compliance with the MFN clause. Defendant refused to comply with the audit. On December 7, 2015, DISH gave notice of breach of contract and on June 22, 2016, DISH filed suit against Defendant, alleging breach of the Sinclair Agreement.

On July 8, 2016, DISH and Defendant entered into a new re-transmission broadcast agreement (the "WLAJ Agreement") (Rec. Doc. 27-7). The agreement was

made retroactively effective as of August 16, 2015. Notably, the WLAJ Agreement includes the following passage:

> **Integration.** This Agreement, together with any documents and exhibits specifically referred to in this Agreement, constitutes the entire agreement between the Parties to this Agreement. . . . Upon execution of this Agreement, all prior agreements and understandings between the Parties related to the Stations will be null and void. Each of the Parties specifically acknowledges that there are no unwritten side agreements or oral agreements between the Parties that alter, amend, modify or supplement this Agreement.

(Rec. Doc. 27-7 at 20). In April of 2018, Defendant filed its Motion. On July 26, 2018, this matter was transferred to the undersigned judge. The Court heard oral argument on the matter on October 24, 2018 and took the matter under advisement.

## PARTIES' ARGUMENTS

Defendant argues it is entitled to dismissal or summary judgment on three grounds: "[1] The assigned re-transmission agreement on which DISH bases its case is now null and void; [2] The more favorable fee provisions of the null and void re-transmission agreement were never assigned to WLAJ anyway; and, [3] Even if the agreement were not null and void, and even if the 'more favorable' fee provision had been part of the assigned agreement, it would not be applicable here, where DISH seeks to apply it to WLAJ on a station-by-station basis in conflict with the averaging language of the Sinclair agreement." (Rec. Doc. 27-1 at 2).

Plaintiff counters that the WLAJ agreement did not extinguish Plaintiff's right to enforce the Sinclair Agreement. (Rec. Doc 32-1 at 16-19). Plaintiff argues that the "null and void" language is nothing more than a merger provision, which seeks to make clear that there are no other oral or written agreements binding the Parties. In

other words, the language is intended to require a court to enforce the parol evidence rule. Plaintiff argues that the words "null and void" at most *terminated* the Sinclair Agreement, but did not rescind it. The distinction being that plaintiffs can seek to enforce prior breaches of a terminated contract, but not a rescinded contract. Further, Plaintiff argues that the audit provision survived termination pursuant to the to the survival provision of the Sinclair Agreement. Thus, Plaintiff had a right to audit Defendant in order to determine whether Defendant had complied with the MFN provision prior to contract termination. To the extent that "null and void" is ambiguous, Plaintiff offers evidence that Parties had considered but ultimately did not agree to a "clean slate" provision.

Second, Plaintiff argues that Defendant explicitly agreed to assume the Sinclair Agreement and did so without reservation. (Rec. Doc. 32-1 at 4). Plaintiff argues that Sinclair's alleged redaction of a provision had no effect on Defendant's assumption of the entire agreement, and that Defendant failed to do due diligence before assuming the Sinclair Agreement. Finally, Plaintiff argues that summary judgment is improper, because discovery might reveal facts that contradict Defendant's deposition evidence. (Rec. Doc. 32-1 at 8-9).

## THE PROPER LEGAL STANDARD

Defendant primarily frames its Motion as a request for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). According to the Rules, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice

of what the claim is and the grounds upon which it rests." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (internal citations omitted). The allegations "must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1).

"Under Rule 12(b)(6), a claim may be dismissed when a plaintiff fails to allege any set of facts in support of his claim which would entitle him to relief." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) (citing *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 561 (5th Cir. 1998)). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). The court is not, however, bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678. "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Taylor*, 296 F.3d at 378.

Alternatively and out of an abundance of caution, Defendant asks its Motion be considered a motion for summary judgment. Rule 12(d) specifies that, if matters outside of the pleadings are presented and not excluded by the court on a Rule 12(b)(6) motion, the motion must be treated as a motion for summary judgment. However, not

all evidence is subject to this rule. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "[C]ourts ordinarily examine, when ruling on Rule 12(b)(6) motions to dismiss, . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* (citing 5B C. WRIGHT & A. MILLER, FED. PRAC. & PROC. CIV., § 1357 (3d ed. 2004). The Sinclair Agreement is incorporated by reference in the Complaint, so consideration of this evidence will not render this Court's decision a summary judgment. In attaching the Sinclair Agreement to its Motion, "defendant merely assist[ed] the plaintiff in establishing the basis of the suit." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). However, the WLAJ Agreement cannot be said to be referenced in the Complaint, because it was drafted only after the Complaint was filed. Nor does this Court believe the WLAJ Agreement to be "central" to Plaintiff's claim; Plaintiff could certainly prevail without this evidence. *See id.* Thus, the Court finds that by considering the WLAJ Agreement, the Court would necessarily convert Defendant's Motion to one for summary judgment.

The Court notes that "conversion by the district judge should be exercised with great caution and attention to the parties' procedural rights," 5C C. WRIGHT & A. MILLER, FED. PRAC. & PROC. CIV. § 1366 (3d ed. 2004), but there is no mistaking that the Parties were prepared for conversion in this case. Defendant's original Motion welcomed this Court to apply the Rule 56 standard—thereby putting Plaintiff on notice—and Plaintiff introduced its own summary judgment evidence in the form of an e-mail chain exchanged among the Parties' attorneys concerning the drafting of

the WLAJ Agreement. (Rec. Doc. 32-7), *Isquith for and on Behalf of Isquith v. Middle S. Utilities, Inc.*, 847 F.2d 186, 195 (5th Cir. 1988) (finding that procedural safeguards of Rule 56 require notice to party that court *could* rule pursuant Rule 56, not that it *would*). The choice of whether to exclude extra-pleading material or consider it under a Rule 56 standard is within the discretion of the district court. *Id.*

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)), *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving

party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

## DISCUSSION

Plaintiff has filed suit for breach of the Sinclair Agreement it alleges that Defendant assumed. Specifically, Plaintiff alleges that Defendant breached by failing to comply with the audit requirement of Section 23 of the Sinclair Agreement. (Rec. Doc. 15).[1] The Parties agree that New York law controls in this case. (Rec. Doc. 32-1 at 7). "Where, as here, the proper resolution of the case turns on the interpretation of [New York] law, [district courts] "are bound to apply [New York] law as interpreted by the state's highest court." *Am. Intern. Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 564 (5th Cir. 2010) (quoting *Barfield v. Madison Cnty., Miss.*, 212 F.3d 269, 271–72 (5th Cir. 2000)). "Under New York law, there are four elements to a breach of contract claim: '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188–89 (S.D.N.Y. 2011) (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). Here, the "existence" of the Sinclair Agreement effectively turns on this Court's interpretation of the phrase "null and void" in the WLAJ Agreement.

---

[1] Plaintiff also asks for declaratory relief in the form of an order declaring that Defendant assumed the Sinclair Agreement in its entirety and that the MFN clause will be applied in such a way that WLAJ is the only retransmission fee aggregated in calculating the MFN rate.

Additionally, Defendant argues it did not breach the Sinclair Agreement, because it never assumed the audit or MFN provisions or because the provisions cannot be appropriately applied to Defendant.

New York law holds that the "the initial interpretation of a contract 'is a matter of law for the court to decide.'" *K. Bell & Associates, Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (citation omitted). Unless a term is found to be ambiguous, New York law generally prohibits consideration of any evidence beyond the four corners of a contract. *See W., Weir & Bartel, Inc. v. Mary Carter Paint Co.*, 255 N.E.2d 709, 711 (N.Y. 1969). In other words, "extrinsic evidence may not be used to create an ambiguity in an otherwise unambiguous agreement." *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993). "Whether or not a writing is ambiguous is a question of law to be resolved by the court." *W.W.W. Associates, Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990). Contractual language is unambiguous if it possesses "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quoting *Breed v. Insurance Company of North America*, 46 N.Y.2d 351, 355 (N.Y. 1978). "Where reasonable minds could be said to differ because the language the parties used in their written contract is susceptible to more than one meaning—each as reasonable as the other—and where extrinsic evidence of the parties' actual intent exists, it should be submitted to the trier of fact." *Consarc Corp.*, 996 F.2d at 573. "[I]nterpretations that render contract provisions

meaningless or superfluous" are disfavored. *Manley v. AmBase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003).

## I.

This case poses several difficult questions of contract interpretation. The first that the Court must resolve is the consequence of the WLAJ Agreement's declaration that, "Upon execution of this Agreement, all prior agreements and understandings between the Parties related to the Stations will be null and void." (Rec. Doc. 27-7 at 20). Defendant argues the effect of the language is plain: "whatever rights and obligations WLAJ and DISH owed one another under the pre-existing re-transmission agreement were rescinded and replaced by the rights and obligations they agreed to under their new re-transmission agreement." (Rec. Doc. 27-1 at 12). Plaintiff cites to an opinion that gives some support to its proposition that a "null and void" contract is one that has been rescinded. In *Rekis v. Lake Minnewaska Mt. Houses, Inc.*, 573 N.Y.S.2d 331, 335 (N.Y. App. Div. 3d Dept. 1991), the court stated that a plaintiff seeking to have a contract "declared null and void" was in fact seeking the "equitable remedy of rescission." The *Rekis* court wasn't interpreting contractual language, but the opinion does show that "null and void" might signify what is often referred to as an "agreement of rescission." An agreement of rescission is an agreement among parties to discharge the duties owed to one another. *See* RESTATEMENT (SECOND) OF CONTRACTS § 283 (1981); *see also M.J. Posner Const. Co., Inc. v. Valley View Dev. Corp.*, 499 N.Y.S. 2d 997, 999 (N.Y. App. Div. 3d Dept. 1986) ("Generally, the agreement of rescission operates as an accord and satisfaction of the

prior covenants."). If this Court found the "null and void" language to constitute an agreement of rescission, the result would be that DISH and WLAJ have released any possible claims they had against each other for any breach of the Sinclair Agreement. *See M.J. Posner*, 499 N.Y,S, 2d at 999.[2] Summary judgment for the Defendant would be appropriate in that case.

Plaintiff does not quibble that the WLAJ Agreement supersedes the Sinclair Agreement, but argues that the effect of the "null and void" language was a "termination," rather than a rescission. A termination differs from a rescission in that, "[o]n 'termination' all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives." UNIF. COMMERCIAL CODE § 2-106. Does that distinction matter here? Plaintiff argues it does. According to section 23 of the Sinclair Agreement, the right to audit survives one year past expiration of the term of the Sinclair Agreement. (Rec. Doc. 27-6 at 14). The Sinclair Agreement not only expired, it was at the least terminated, but section 24 of the Sinclair Agreement states that, "Any provision of this Agreement which logically would be expected to survive termination or expiration of the Agreement shall survive termination or expiration." (Rec. Doc. 27-6 at 14). Thus, according to Plaintiff, "DISH continues to have the right to seek remedies for breaches of the prior

---

[2] Contrary to Plaintiff's claims, where a contract requires mutual execution, an agreement of rescission does not necessarily require each party to return any benefit already received. *See* RESTATEMENT (SECOND) OF CONTRACTS § 283 (1981) ("An agreement of rescission discharges all remaining duties of performance of both parties. It is a question of interpretation whether the parties also agree to make restitution with respect to performance that has been rendered.").

Agreement even as the parties agree their current and future conduct will be governed by the New Agreement." (Rec. Doc. 32-1 at 17).

In support of its interpretation of the "null and void" provision, Plaintiff relies *Primex Intern. Corp. v. Wal-Mart Stores, Inc.*, 679 N.E.2d 624 (N.Y. 1997), a case concerning the viability of an arbitration clause in a contract superseded by a new agreement which included an integration provision. The integration provision stated:

> This Agreement may not be amended, changed, modified, or altered except by a writing signed by both parties. All prior discussions, agreements, understandings or arrangements, whether oral or written, are merged herein and this document represents the entire understanding between the parties.

*Id.* at 596-57. The Court of Appeals of New York noted that arbitration agreements generally survive and remain enforceable as to disputes that arise out of obligations owed pursuant to the underlying contract regardless of whether the contract has expired or has been canceled by breach. *Id.* at 599. The court opined that "the purpose of a general merger provision"—which typically uses the quoted language—is "to require full application of the parol evidence rule." *Id.* Accordingly, the court held that the above language in the merger agreement was insufficient to retroactively revoke the parties' mutual consent to arbitrate disputes stemming from the original contract. *Id.*

Obviously, the integration provision in *Primex* did not use the words "null and void." Rather, the *Primex* provision specifically stated that agreements were "merged"—language ordinary to an integration provision. *Id. Primex*, therefore, is not dispositive. Nevertheless, in the WLAJ Agreement the phrase "null and void" comes

near the end of the contract, in a subsection labeled "**Integration**," surrounded by language typical of an integration agreement.[3] Viewed in this context, it would appear that "null and void" is intended to strengthen the effect of the integration provision. However, that finding is not particularly helpful, because integration provisions may have different effects depending on the intent of the signatories to the contract; one possible effect is a waiver of claims. *See id.* at 601-602 ("[A] contract merger clause may be considered the equivalent of a general release of substantive claims under a prior Agreement.") (citing 3 CORBIN, CONTRACTS § 578 (1960)). Therefore, the Court must still determine what effect is to be given "null and void" in the context of an integration provision.

Defendant's argument that the meaning of "null and void" as a contractual term is clearly established by New York law is severely undercut by a cursory review of the handful of cases it relies on. Defendant cites to no opinion considering that phrase as a contractual term. The court in *Bronx Store Equip. Co., Inc. v. Westbury Brooklyn Associates, L.P.*, 721 N.Y.S.2d 28 (N.Y. App. Div. 1st Dept. 2001), unlike the court in *Rekis*, does not even utter "null and void" in its opinion. *See also M.J. Posner Const. Co., Inc. v. Valley View Dev. Corp.*, 499 N.Y.S.2d 997, 999 (N.Y. App. Div. 3d Dept. 1986) (same); *Jacob Gold Realty Inc. v. Sckoczylas*, 720 N.Y.S.2d 324, 324 (N.Y. App. Term. 2000) (same).

Plaintiff, likewise fails to turn up any New York case law establishing that "null and void" unambiguously signifies a termination. *Primex*, although relevant,

---

[3] For example: "This Agreement, together with any documents and exhibits specifically referred to in this Agreement, constitutes the entire agreement between the Parties." (Rec. Doc. 27-7 at 20).

concerned only language typical of integration agreements and not the phrase at issue. The only decision that Defendant provides where a New York court even uses the phrase "null and void" is a surrogate's court opinion dating from 1962. *See In re Cairns' Est.*, 33 Misc. 2d 621 (N.Y. Sur. 1962). That opinion's analysis as to the effect of "null and void" is so vague that each of the Parties urges that it supports its respective argument. It provides little insight into how New York's highest court would decide this case.[4] This Court has also searched in vain for New York case law indicating whether "null and void" means "terminated" or "rescinded." What relevant case law this Court has found, confirms that the phrase is not used with sufficient precision to be unambiguous in this case.

In *Indovision Enterprizes, Inc. v. Cardinal Export Corp.*, 354 N.Y.S.2d 113, 114 (N.Y. App. Div. 1st Dept. 1974), a New York appellate court considered a letter extending an offer of sale and delivery of a number of bicycles. The letter included this provision: "This offer will be deemed null and void if letters of credit, as required in this letter, are not opened." *Id.* The offer was accepted pursuant to the terms of the offer. *Id.* However, no line of credit was ever opened. The court below held that this provision prevented any recovery upon invocation and granted summary judgment against the seller-offeror who sued for breach of contract. *Id.* However, on review, the appellate court found that this result was tantamount to holding that the buyer could

---

[4] The surrogate court held that a "null and void" provision "terminated the indebtedness," which rendered the bond and mortgage "extinguished." *In re Cairns' Est.*, 33 Misc.2d at 624. The court was obviously concerned only with the result—that the executor could not offset bequests made to the two mortgagors—which could be achieved without the need to resolve the more technical question before this Court today.

by its own act nullify its agreement, a "commercial absurdity." *Id.* at 115. Thus, the appellate court found that reasonable minds could differ as to whether the parties intended the "null and void" provision to have the effect of rescinding the contract or placing the buyer in default and terminating the seller's obligations. *Id.* One judge, convinced that the "null and void" provision unambiguously prevented recovery under the agreement, dissented. *Id.* at 230 ("[T]he 'contract' is clear and unambiguous, and no extraneous circumstances may be considered to whittle away the clearly declared intent of the parties, so prominently expressed in the writing drafted by plaintiff."). It appears that the majority concluded that the phrase "null and void" could be naturally read to prevent recovery for breach of the agreement, but that was unlikely to be the intent of the parties in the context of the agreement.

In *Wiser v. Enervest Operating*, L.L.C., 803 F. Supp. 2d 109, 124 (N.D.N.Y. 2011), the court was tasked with interpreting disputed oil and gas leases that included an "unless" clause: "This Lease is made on the condition that it will become null and void and all rights hereunder shall cease and terminate unless work . . . is commenced." *Id.* at 120. Based on this language, the court held that "the leases automatically terminated upon defendants' failure to make delay rental payments." *Id.* at 125. In other words, the court interpreted "null and void" in that specific context to have the effect of cancelling the agreement.[5]

---

[5] The UCC recognizes "cancellation" as yet another distinct end for a contract. UNIF. COMMERCIAL CODE § 2-106 ("'Cancellation' occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of "termination" except that the cancelling party also retains any remedy for breach of the whole contract or any unperformed balance.").

A contract that is "null" has "no legal effect" and is "without binding force." BLACK'S LAW DICTIONARY (10th ed. 2014) ("The phrase null and void is a common redundancy."); *see also* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993) (defining "null and void" as "having no force, binding power, or validity"). However, whether the Parties by invoking the phrase "null and void" meant that their prior agreements were no longer effective (terminated), or that their prior agreements *never* had legal effect (rescinded by agreement) is unclear to this Court. As the small sample of cases cited above demonstrates, both courts and parties acting pursuant to New York law have used "null and void" as a synonym for "terminated," "cancelled," "extinguished," and "rescinded." It is clear that where a provision is invoked rendering a contract "null and void," the agreement is rendered ineffective. What is unclear is whether this ineffectiveness bars recovery for prior breaches of the contract; this more subtle question would appear to depend on the context in which the phrase occurs. *See Indovision*, 354 N.Y.S.2d at 114, *Wiser*, 803 F. Supp. 2d at 124.

Here, considering "null and void" in the context of the larger agreement does not render the meaning any more pellucid. On the one hand, if the Parties intended the term "null and void" to have the effect of merely terminating the contract, then it is curious that the parties did not use the word "terminate" as they do elsewhere in the contract. (Rec. Doc. 27-7 at 3). On the other, it would be very strange for the Parties to waive substantive claims against each other for prior breaches of other agreements pursuant to three words tucked under a paragraph marked "Integration" in the back of the contract. (Rec. Doc. 27-7 at 20). Neither reading would render the

words "null and void" superfluous; Parties have not pointed to any other language in the contract effecting a termination or a rescission.[6] Moreover, the WLAJ Agreement specifically states that no inference is to be taken against the drafter. (Rec. Doc. 27-7 at 19). As the court in *Indovision* held, given the context of the entire WLAJ Agreement, this Court finds that reasonable minds could differ whether the Parties intended the "null and void" language to waive any and all claims available to the Parties for breach of prior agreements or to merely terminate the executory obligations of agreements superseded.

Because the contract ambiguous, consideration of parol evidence is appropriate. *JA Apparel Corp.*, 568 F.3d at 397. Plaintiff filed suit for Defendant's failure to comply with the audit provision in the Sinclair Agreement before the Parties entered into the WLAJ Agreement on July 8, 2016. Plaintiff has attached as evidence an e-mail chain indicating the Parties were considering waiving all claims against one another by use of a "clean slate" provision, but ultimately decided against a "clean slate" on the same day the WLAJ Agreement was ratified. (Rec. Doc. 32-7). Defendant counters that the clean slate provision was necessary to waive non-contractual claims. Thus, Defendant argues, the parol evidence does not indicate "null and void" was not intended to waive DISH's breach of contract claims. (Rec. Doc. 34-2 at 4). To what extent this evidence, and whatever else is garnered during

---

[6] Defendant argues that, considering the Sinclair Agreement had expired according to its terms, it would be superfluous for the Parties to negotiate a termination provision into the WLAJ Agreement. If the Court were to go down that analytic route, however, the Court would also need consider that the "null and void" language appears to be lifted from the Sinclair Agreement, which has a substantively identical integration paragraph. Again, the Court is left to wonder why the Parties would insert an agreement to discharge claims being litigated contemporaneously, using a recycled integration provision.

discovery, says about the intent of the Parties in using the phrase "null and void" is for the trier of fact to decide. *See Town of Wilson v. Town of Newfane*, 581 N.Y.S.2d 962, 963 (N.Y. App. Div. 4th Dept. 1992) ("If there is ambiguity in the terminology used . . . and a determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such determination is to be made by the jury.") (citation omitted).

## II.

Defendant also alleges that dismissal or summary judgment is appropriate on another ground—that Defendant never assumed the contractual provisions that DISH seeks to enforce. Defendant admits that it notified DISH in writing that it would be assuming the Sinclair agreement. However, Defendant alleges the version of the Sinclair Agreement that Defendant received from Sinclair had section 22—the MFN clause—redacted. Thus, Defendant did not assume this part of the Sinclair Agreement, because there was no "meeting of the minds" regarding this particular contractual provision. (Rec. Doc. 27-1 at 9-10). Defendant provides no case law beyond that establishing this basic principle of contract law.

Plaintiff counters that it agreed to allow Sinclair to assign the Sinclair Agreement to Defendant only in its entirety and that when Defendant gave notice to Plaintiff it was assuming the Sinclair Agreement, it did so without reservation. Moreover, Plaintiff argues that Plaintiff had notice of the MFN provision by virtue of the unredacted audit provision, which explicitly states the audit right is designed so

that DISH may check for compliance with section 22. According to Plaintiff, Defendant had a duty to investigate the Sinclair Agreement before it agreed to assume it. (Rec. Doc. 32-1 at 20) (citing *Sitar v. Sitar*, 61 A.D. 3d 739, 742 (N.Y. App. Div. 2009) (granting summary judgment on plaintiff's fraud claims, because plaintiff failed "exercise ordinary diligence" in reviewing the books of an entity plaintiff purchased).

The Court agrees with Plaintiff that Defendant failed to satisfy its duty to investigate the contract that it agreed to assume. When this Court asked defense counsel at oral argument why Defendant didn't inquire into what obligations it was agreeing to assume under section 22, defense counsel's only response was that the purchase of a television station is a complicated business, requiring review of many contracts. That may be so, but that is no reason for this Court to strike provisions of an agreement that the Defendant agreed to assume without exception.

## III.

Finally, Defendant argues that dismissal or summary judgment is appropriate because the "'more favorable fee' applied only on an aggregate basis to all 82 stations listed in Exhibit A of Sinclair's re-transmission agreement. (Rec. Doc. 27-1 at 11). In other words, regardless of this Court's finding that Defendant agreed to assume the entire Sinclair Agreement, Defendant argues that the MFN provision simply cannot be applied as written now that WLAJ has been sold to a single-station operator. Defendant quotes language from the Sinclair Agreement, which purportedly suggests

that the original signatories only contemplated applying the MFN provision where an operator, such as Sinclair, owns many stations in contract with DISH:

> For clarity . . . [Sinclair] and DISH expressly acknowledge and agree that "Net Fee" means the net effective per subscriber rate . . . based on all . . . economic outlays . . . payable to Operator by DISH . . . on an aggregate (rather than on a station-by-station) basis for all Stations carried by DISH or the MFN Other Distributor.

(Rec. Doc. 27-6 at 13). Thus, Defendant argues Plaintiff has no basis for auditing a single station, because compliance with the MFN clause can only be adjudged when an aggregate re-transmission fee is calculated.

Plaintiff argues that the use of the word "aggregate" does not preclude application of the MFN provision to a single-station operator, such as WLAJ. Rather, in the case of a single-station operator, the aggregate fee is calculated in the same way it would be if the provision were to be applied to Sinclair. Here, it so happens that the re-transmission fees collected by WLAJ are the only re-transmission fees collected by Defendant, so the "aggregate re-transmission fee" or "net fee" is equal to that of WLAJ's re-transmission fees standing alone.

The Court agrees with Plaintiff that use of the word "aggregate" does not preclude application of the MFN provision to a single-station operator, such as Defendant. An "aggregate" is simply a "sum total." MERIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1999). Whether the sum total is the fee of one station, or two stations, or eighty-two stations, that number is calculable within the contemplation of the Sinclair Agreement. The MFN formula is easily applied in this case.

Defendant's contention is not really that the formula cannot be applied mathematically. Rather, it is that applying the MFN provision as written creates an absurd result. Defendant provides a hypothetical. If one of Sinclair's station, such as WLAJ, had negotiated fees more favorable to DISH's competitors, that would not necessarily render Sinclair, as the operator of 82 stations, in breach of the Sinclair Agreement, because the fees charged by WLAJ would be averaged with the fees charged by the other 81 stations. It is presumed that some of Sinclair's stations charge fees more favorable to rival re-transmitters and others charge fees that are less favorable. Sinclair's only concern as a multi-station operator is to ensure that on average, its stations are not violating the MFN provision. However, by removing a station from multi-station-operator Sinclair, to a single-station operator, such as Defendant, the inputs of the formula change significantly. The single-station operator of a station charging more favorable fees to other re-transmitters is now in breach of the MFN provision, not because its fees have changed, but because the "net fee" has changed now that the other station's fees are not included in the aggregate.

The Court does not think this result is absurd. DISH contracted with the operator of WLAJ in a manner that ensured it would never receive a worse deal than its re-transmitter competitors. The sale of WLAJ to Defendant does not deprive DISH of that benefit it contracted for. Quite to the contrary, as the Court found above, Defendant agreed to assume the contract in its entirety. It would have been foreseeable to a party that performed its due diligence that purchase of WLAJ by a

single-station-operator could create a breach of the Sinclair Agreement. The MFN formula is not a difficult one to apply.

With the benefit of adequate inquiry into the terms of the Sinclair Agreement, Defendant could have availed itself to several options before it purchased WLAJ. Defendant could have negotiated a better price from Sinclair for the station to compensate for the anticipated breach or refused to adopt the entirety of the Sinclair agreement. Defendant failed to ask what it was agreeing to undertake pursuant to section 22, and now must bear the consequences of that lapse—assuming that the trier of fact finds that the Parties did not agree to rescind the Sinclair Agreement.

**CONCLUSION**

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment* **(Rec. Doc. 27)** filed by Defendant, WLAJ-TV is **DENIED**.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE
